IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Carolina Pride, Inc., A South Carolina Corporation d/b/a The Lions Den, | ) ) ) | C.A. No. 3:08-04016CMC |
| Plaintiff, | ) ) ) | AMENDED[1] OPINION AND ORDER GRANTING MOTION FOR |
| vs. | ) ) | PRELIMINARY INJUNCTION |
| Henry McMaster, South Carolina Attorney General, in his Official Capacity, H. B. Limehouse, Jr., South Carolina Secretary of Transportation, in his Official Capacity, | ) ) ) ) ) ) | |
| Defendants.[2] | ) ) | |

This matter is before the court on Plaintiff's motion to enjoin Defendants from enforcing S.C.

Code Ann. § 57-25-145 *et seq.* The challenged statute was enacted in February 2006 as Act No. 235

("the Act") and prohibits most businesses which offer sexually-oriented materials or entertainment

from using any "off-premises, outdoor advertising . . . located within one mile of a public highway."

S.C. Code Ann. § 57-25-145. Signs which would otherwise be prohibited by the Act, but which

were in existence at the time of its passage, do not become subject to the Act's prohibitions until

February 22, 2009. Plaintiff maintains six such signs (at four locations) and has been notified that

its signs will be in violation of the Act if they are not removed by February 22, 2009. Plaintiff filed

this motion to enjoin enforcement of the Act pending resolution of this action on its merits.

---

[1]  This order grants, in part, Defendants' motion to reconsider by making amendments to former footnotes 6 and 14 (now 7 and 15), amending a cross reference on page 22 to former footnote 13 (now 14), and adding text on page 13 relating to Plaintiff's burden of proving that it is engaged in a legal commercial activity.

[2]  A third Defendant, David M. Pascoe, Jr., Solicitor for the First South Carolina Judicial District, was voluntarily dismissed on January 12, 2009. The caption is hereby amended to reflect that dismissal.

For the reasons set forth below, the court grants Plaintiff's motion for a preliminary injunction. The court makes the following findings in support of the injunction: (1) Plaintiff will suffer irreparable harm if the motion is not granted; (2) the corresponding risk of harm to Defendants in delaying enforcement until resolution on the merits is limited; (3) Plaintiff has shown a more than sufficient likelihood of success on the merits to support injunctive relief; and (4) the public interest favors delay in enforcement given the strong likelihood that the statute will, ultimately, be found unconstitutional.

## BACKGROUND

**Plaintiff's business and advertising.** Plaintiff operates an adult bookstore in South Carolina. That bookstore, named The Lions Den, constitutes a "sexually oriented business" within the scope of the prohibitions found in the Act. *See* S.C. Code Ann. § 57-25-120(9) (defining sexually oriented business). For present purposes, the court accepts as true Plaintiff's claims that its merchandise is sold only to adults and that it conducts only a legal and constitutionally protected business.[3]

Plaintiff advertises the existence and location of The Lions Den on six off-site outdoor advertising signs. Each of these signs is located within one mile of a public highway (Interstate highways I-26 and I-95).[4] None of the signs bears an erotic image. Instead, each consists primarily

---

[3] Plaintiff has submitted an affidavit stating that it sells only to adults and that the materials it sells are constitutionally protected, non-obscene erotic printed matter, videos and other items. While Defendants do not concede that Plaintiff sells only to adults and that the merchandise sold is legal and subject to constitutional protections, they offer no evidence in support of a contrary conclusion.

[4] During oral argument, Plaintiff's counsel advised the court that The Lions Den also advertises its existence and location through an on-site sign which is visible from an interstate highway. Defendants did not challenge this factual statement. Defendants also conceded that the

of text which informs observers of the existence and location of The Lions Den and describes it as an adult book store.[5]

Plaintiff has submitted evidence that the six signs at issue in this motion bring in a significant portion of its business, as motorists drawn from the interstate highways where these signs are located form a substantial part of The Lion Den's customer base. Plaintiff has also submitted evidence that the signs constitute a primary means of advertising and that enforcement of the Act will have a substantial and immediate financial impact on its business. Defendants have presented no evidence to contradict any of these claims.

**The challenged law.** In February 2006, the South Carolina General Assembly passed Act No. 235 ("the Act"), which amended the Highway Advertising Control Act.[6] The Act was adopted on February 22, 2006, over the veto of the Governor. It took effect by operation of law the same day. Section 3A of the Act is now codified at S.C. Code Ann. § 57-25-145. That code section prohibits outdoor advertising signs by any "adult business" or "sexually oriented business" within one mile of any public highway.

As codified, the relevant provisions of the Act read as follows:

---

statute does not reach on-site signs, even if visible from the interstate highway.

[5] The only image on Plaintiff's signs is an outline of the profile of a lion. This image is found on some but not all of Plaintiff's signs.

[6] The Highway Advertising Control Act was originally adopted in the early 1960's and remained substantially unchanged until adoption of the 2006 amendments at issue in this action. The restrictions other than those added by the 2006 amendments apply equally to most enterprises (there being limited exceptions for utility warning and information signs, service clubs and religious organizations, and real estate advertisements). Further, these "original restrictions apply only to signs visible from the main-traveled way of two defined highway systems: the "Interstate system" and the "Federal-aid primary system." *See* S.C. Code Ann. §§ 57-25-120 (definitions) & 57-25-140 (restrictions).

§ 57-25-145.

Outdoor advertising signs for adult or sexually-oriented business; location restriction; continuation as nonconforming use; penalties.

(A) Notwithstanding the provisions of Section 57-25-140 or another provision of law, an off-premises, outdoor advertising sign for an adult or sexually-oriented business may not be located within one mile of a public highway.

(B) Outdoor advertising signs in existence at the time of the effective date of this section [February 22, 2006], which do not conform to the requirements of this section, may continue as a nonconforming use, but must conform within three years of the effective date of this section.

(C) An owner of an adult or sexually-oriented business who violates the provisions of this section is guilty of a misdemeanor and, upon conviction, must be imprisoned for not more than one year. Each week a violation of this section continues constitutes a separate offense.

S.C. Code Ann. § 57-25-145.

The majority of the operative terms set forth above were specifically defined by the Act and added to the already codified definition of "sign."

§ 57-25-120. Definitions.
* * *
(3) "Sign" or "outdoor advertising sign" means an outdoor sign, display, device, figure, painting, drawing, message, plaque, poster, billboard, or other thing which is designed, intended, or used to advertise or inform, or any part of the advertising or its informative contents.
* * *
(7) "Adult business" means a nightclub, bar, restaurant, or another similar establishment in which a person appears in a state of sexually explicit nudity, as defined in Section 16-15-375, or semi-nudity, in the performance of their duties.

(8) "Semi-nudity" means a state of dress in which opaque clothing fails to cover the genitals, anus, anal cleft or cleavage, pubic area, vulva, nipple and areola of the female breast below a horizontal line across the top of the areola at its highest point. Semi-nudity includes the entire lower portion of the female breast, but does not include any portion of the cleavage of the human female breast exhibited by wearing clothing provided the areola is not exposed in whole or in part.

(9) "Sexually-oriented business" means a business offering its patrons goods of

4

which a substantial portion are sexually-oriented materials.  A business in which more than ten percent of the display space is used for sexually-oriented materials is presumed to be a sexually-oriented business.

(10) "Sexually-oriented materials" means textual, pictorial, or three-dimensional material that depicts nudity, sexual conduct, sexual enticement, or sadomasochistic abuse in a way that is patently offensive to the average person applying contemporary adult community standards with respect to what is suitable for minors. Sexually-oriented materials include obscene materials as defined in Section 16-15-305(B).

S.C. Code Ann. 57-25-120 *et seq.*[7]

Section 3C of the Act revised S.C. Code Ann. § 57-25-130 to alter the enumerated legislative purposes and findings supporting the regulation of outdoor advertising, to include the following purpose: " [to] mitigate the adverse secondary effects of sexually-oriented businesses and limit harm to minors."  Defendants do not, however, rely solely on this stated purpose in their present memorandum.  Instead, they assert that the legislature *also* relied on three of the stated purposes underlying earlier restrictions found in S.C. Code Ann. § 57-25-10 *et seq.*  These stated purposes, which were given in support of general restrictions on signs visible from specified categories of roads, are as follows: (1) "prevent[ing] unreasonable distraction of operators of motor vehicles"; (2) "promot[ing] the safety, convenience, and enjoyment of travel on . . . highways within this State,"; and (3) "promot[ing] the prosperity, economic well-being and general welfare of the State."  *See* Dkt. No. 41 at 5 (citing S.C. Code Ann. § 57-25-130).

The Declaration of Purpose also acknowledges that the above concerns must be balanced

---

[7] "Public highway" is not defined in the Act and would appear to be far broader than the defined terms "Interstate system" and "Federal-aid primary system" which have long been contained in (and restricted the reach of) the Highway Advertising Control Act.  At oral argument, Defendants conceded that the term public highway could include every publicly owned road in the state (including dirt roads subject to municipal ownership).  Given this broad reach, the Act's prohibition on outdoor advertising within one mile of a public highway effectively amounts to a statewide ban on a single industry's use of off-site advertising through billboards, signs, posters or similar means.

against business interests. Specifically, the General Assembly found

> that outdoor advertising is a legitimate form of commercial use of the private property adjacent to the public highways. [It also found] that outdoor advertising is an integral part of the business and marketing function and is an established segment of the national econmomy which serves to promote and protect investments in commerce and industry and is, therefore, a business which must be allowed to exist and operate where other business and commercial activities are conducted and that a reasonable use of this property for outdoor advertising to the traveling public is desirable.

S.C. Code Ann. § 57-25-130.[8]

Violation of Section 57-25-145 is a Class C misdemeanor crime.  *See* S.C. Code Ann. §§ 16-1-100(C) & 57-25-145.  Such a crime is punishable by a mandatory term of imprisonment of up to one year under S. C. Code Ann. §§ 57-25-145(C) (stating person convicted of violating Act "must be imprisoned for no more than one year" and making each week of continued violation a separate offense) and 160-1-20.

The South Carolina Department of Transportation is required to give notice to the owner of any outdoor advertising sign that is in violation of Section 57-25-145.  This notice must advise the owner that it is required to remove the offending sign within thirty days.  S. C. Code Ann. § 57-25-180(A).  If the sign is not removed within that period, agents of the South Carolina Department of Transportation may remove the offending sign at the owner's expense.[9]  S. C. Code Ann. § 57-25-180(B) & (C).

**Defendants.**  Defendant South Carolina Attorney General Henry McMaster is the chief

---

[8]  This aspect of the statute's declaration of purpose is currently the same as when this section of the code was originally adopted in 1962.

[9]  Plaintiff's signs are leased from a third-party.  Plaintiff is not, therefore, the "owner" of the sign.  Plaintiff would, nonetheless, be directly affected by removal of the signs given the direct impact on its ability to exercise its First Amendment rights of commercial speech and the derivative impact on its business.

prosecutorial agent of the State.  Under Article V, Section 24 of the state constitution, he is both charged and empowered with supervising the prosecution of all criminal cases brought in the name of the state, including violations of the statutes adopted by the Act.

Defendant South Carolina Secretary of Transportation H. B. Limehouse oversees the operation of the South Carolina Department of Transportation.  Pursuant to S. C. Code Ann. § 57-1-430(A), Limehouse has control over that department and the activities of its employees, officers, and agents, including control over the administration and enforcement of the statutes contested here.

Both of the Defendants[10] are sued in their official capacity, for the purposes of obtaining declaratory and injunctive relief.  The Act, as codified in S.C. Code Ann. § 57-25-145 and related sections, necessarily constitutes the official policy, practice, custom and usage of the State of South Carolina.  Enforcement of these provisions by the two remaining Defendants, therefore, constitutes the exercise of authority under color of state law.

### STANDARD

**Generally.**  Traditional equity principles require that a court consider four factors in determining whether a preliminary injunction should be granted or denied: (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied, (2) the likelihood of harm to the defendants if the injunction is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest.  *See Child Evangelism Fellowship of Maryland, Inc. v. Montgomery County Public Schs.*, 373 F.3d 589 (4th Cir. 2004) (applying preliminary injunction standard in a First Amendment case); *Safety-Kleen, Inc. (Pinewood) v. Wyche*, 274 F.3d 846, 858-59

---

[10]  Although originally named as a Defendant, David Pascoe, the circuit solicitor with responsibility for the counties in which Plaintiff leases billboards, was voluntarily dismissed from this action.

(4th Cir. 2001); *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991).

The Fourth Circuit requires that a district court consider first the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied. *See Safety-Kleen*, 274 F.3d at 859. Plaintiff must make a "clear showing" that it is likely to suffer irreparable harm if the preliminary injunction is denied. *See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994) (internal quotations omitted). "Generally, 'irreparable injury is suffered when monetary damages are difficult to ascertain [with any accuracy] or are inadequate.'" *Id.* (citing *Danielson v. Local 275*, 479 F.2d 1033, 1037 (2d Cir. 1973)).

After considering the likely irreparable harm to the plaintiff if the preliminary injunction is denied, the court should consider the likelihood of harm to the defendants if the preliminary injunction is granted. *See Safety-Kleen*, 274 F.3d at 859. The court should then determine whether the balance of harm "tips decidedly in favor of the plaintiff," tips in favor of the defendants, or is about equal. *See id.* (citing *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 195 (4th Cir. 1977)); *see also Direx Israel,* 952 F.2d at 817.

If the balance tips decidedly in favor of the plaintiff, plaintiff need only raise substantial and difficult questions of a serious nature as to the merits, sufficient to make those questions fair grounds for litigation. *Direx Israel*, 952 F.2d at 812-13. If there is no imbalance of hardship in plaintiff's favor, then plaintiff's probability of success assumes real significance and the court should decide whether the plaintiff has made a strong showing of likelihood of success on the merits or a substantial likelihood of success by clear and convincing evidence. *See Smyth v. Rivero,* 282 F.3d 268, 276 (4th Cir. 2002) (citing and quoting *MicroStrategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339-40 (4th Cir. 2001)). *See also Direx Israel,* 952 F.2d at 818 (holding that when harms are similar, plaintiffs must make a strong or substantial showing of likelihood of success on the merits).

Once the above factors are considered and resolved, the court must consider whether the public interest favors or disfavors the grant of a preliminary injunction. Ultimately, the court must consider all four factors in deciding whether to grant the requested relief as no single factor is determinative.

**In context of First Amendment challenge.** The first factor takes on greater significance "in the context of an alleged violation of First Amendment rights[.]" *WV Assoc. of Club Owners and Fraternal Services, Inc., v. Musgrave*, ___ F.3d ___, Slip. Op. No. 07-2032 at 9 (4th Cir. Jan. 13, 2009) (addressing First Amendment challenge to limitations on advertising). This is because "a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of [the] First Amendment claim." *Id.   See also Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249, 254-55 (4th Cir. 2003) (noting that a determination of likelihood of success on the merits as to a First Amendment claim supports a finding of irreparable harm) ; *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (noting that loss of First Amendment freedoms, even for a short period of time, constitutes an irreparable injury); *Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir. 1978) ("Violations of [F]irst [A]mendment rights constitute per se irreparable injury.").

Therefore, in motions challenging enforcement of a statute on First Amendment grounds, the court focuses "on the merits of [the] First Amendment claim." *WV Assoc. of Club Owners and Fraternal Services, Inc.,* Slip Op. at 9; *see also Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 520-21(4th Cir. 2002) (upholding grant of preliminary injunction against overbroad statute which prohibited entertainment with simulated sexual activity).

## DISCUSSION

Because this motion relates to an alleged First Amendment violation, the court begins by considering whether Plaintiff is likely to prevail on the merits. *See, e.g., WV Assoc. of Club*

*Owners*, Slip Op. at 9. Analysis of that question is resolved by application of the four-part test set out in *Central Hudson Gas & Elec. Co. v. Public Service Comm. of N.Y.*, 447 U.S. 557 (1980).

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Central Hudson*, 447 U.S. at 566. *See also Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 565 (2001) (finding state ban on advertising cigars and smokeless tobacco products within 1000 feet of a school or playground violated the First Amendment because it failed the fourth prong of *Central Hudson*).[11]

**Central Hudson Applied to Similar Legislation.** Two courts have applied *Central Hudson* to legislation similar to that at issue in this action: *Passions Video, Inc. v. Nixon*, 458 F.3d 837 (8th Cir. 2006); and *State v. Café Erotica, Inc.*, 507 S.E.2d 732 (Ga. 1998). Both cases found the statutes unconstitutional.

**Eighth Circuit Case.** The more recent case, *Passions Video, Inc. v. Nixon*, arose in the Eighth Circuit and involved a challenge to a Missouri law which imposed virtually identical off-site advertising restrictions to those at issue in this action.[12] The signs at issue in *Passions Video* advertised the existence and location of adult businesses. It was undisputed that these signs were both truthful and related to lawful activities, meeting the threshold requirements of *Central Hudson*.

---

[11] Commercial speech – expression which proposes a transaction or communicates useful information to potential buyers or patrons – is well within the protective ambit of the First Amendment. *See, e.g., Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001); *Central Hudson*, 447 U.S. at 561-62 (1980).

[12] Unlike the South Carolina statute, the Missouri statute also restricted on-site advertising. The inclusion of this additional restriction was not, however, determinative of the Eighth Circuit's ruling as to off-site advertising restrictions.

The Eighth Circuit also accepted that the interests proffered by the state in support of the legislation represented substantial state interests. 458 F.3d at 842. Thus, the second factor was also satisfied.[13]

The court briefly summarized Missouri's argument that the statutory ban would directly and materially advance its substantial governmental interests, thus satisfying the third element. In doing so, the court noted Missouri's somewhat curious argument that it intended to reduce the adverse secondary effects by, in effect, driving the sexually oriented businesses out of business.[14]

The court did not, however, find it necessary to decide whether this was a valid approach because the legislation clearly failed the fourth prong of the *Central Hudson* test which considers whether the statute "'curtail[s] substantially more speech than is necessary to accomplish its purpose.'" *Passions Video*, 458 F.3d at 843 (quoting *Krantz v. City of Fort Smith,* 160 F.3d 1214, 1222 (8th Cir. 1998)). As the court explained:

> It is clear that [the challenged Missouri statute] regulates the affected business's

---

[13] The Missouri statute set out a number of purposes including: mitigating the adverse secondary effects of sexually oriented businesses; improving traffic safety; limiting harm to minors; and reducing prostitution, crime, juvenile delinquency, deterioration in property values, and lethargy in neighborhood improvement projects. *Id.* These interests are much the same as relied on by Defendants in the present action.

[14] Defendants in *Passions Video* argued that the ban would serve the ultimate goal of limiting adverse secondary effects by limiting the presence of sexually oriented businesses. The latter limit would be achieved by (1) limiting advertising which would (2) limit customers which would (3) reduce profits which would, (4) ultimately, force the businesses to close. In essence, then, the *Passions Video* defendants argued that they could limit the adverse *secondary* effects, by making a *primary* attack on the business itself. Such an approach would allow for intentional though indirect destruction of otherwise constitutionally protected activities. *See generally Chesapeake B&M, Inc. v. Harford County, Maryland,* 58 F.3d 1005, 1009 (4th Cir. 1995) ("A governmental entity may regulate sexually oriented businesses, including adult bookstores, in an effort to address the undesirable secondary effects associated with them. . . . However, . . . licensing schemes directed at sexually oriented businesses engaged in protected expressive activity pose special problems because of the risks of censorship and suppression associated with prior restraints on speech."). This court finds it unlikely that such an end-run around the First Amendment would be allowed. *See generally City of Los Angeles v. Alameda Books*, 535 U.S. 425, 444-53 (2002) (J. Kennedy concurring opinion).

11

speech; it threatens criminal prosecution for the mere inclusion of the name or address of an affected business on billboards within one mile of a state highway. The Missouri statute "sacrifices an intolerable amount of truthful speech about lawful conduct." *Greater New Orleans Broad. Assoc.* [*Inc. v. United States,* 527 U.S. 173, 194 (1999)]. The prohibition is directed at speech beyond that which would lead to the stated secondary effects, and is not narrowly tailored to achieve Missouri's stated goal. *See State v. Café Erotica, Inc.,* . . . 507 S.E.2d 732, 735 (1998)[.]

* * *

In our view, the state has "failed to make a showing that a more limited speech regulation would not have adequately served the State's interest." *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 500 (1996) (Op. of Stevens, J. for four members of the Court) . . . . Accordingly, we find that [the] Missouri statute . . . fails to satisfy the *Central Hudson* test for regulations on commercial speech.

*Passions Video*, 458 F.3d at 843.

**Georgia Case.** The Eighth Circuit relied, *inter alia*, on a Georgia Supreme Court decision which held a similar statute unconstitutional. *See Passions Video,* 458 F.3d at 843 (quoted *supra*). The statute at issue in *Café Erotica*, Ga. Code. Ann. § 32-7-75(b), prohibited any off-premises outdoor advertising by adult businesses where nudity was exhibited. *Café Erotica,* 507 S.E.2d at 733. Applying *Central Hudson*, the Georgia Supreme Court found the statute invalid under the First Amendment because it was not narrowly crafted to advance the asserted state interest of traffic safety:

We now consider the final criterion of *Central Hudson Gas* – whether the complete suppression of off-site outdoor advertising of commercial establishments where nudity is exhibited is more extensive than necessary to achieve the State's asserted objectives. In this regard the State submits that [the statute] is narrowly tailored to achieve its purpose in that it does not seek to ban all outdoor advertising, and allows for other advertising media. We do not read the restriction in that manner. By restricting *"[a]ny outdoor advertising* of a commercial establishment where nudity is exhibited,"* [the statute] has gone further than necessary in seeking to meet its ends. It is not directed solely at provocative images, but it prohibits even a worded sign advertising the location of a business. Because we conclude that traffic safety could be served as well by a more limited restriction on commercial speech, we hold that the legislation is not narrowly tailored to achieve its stated goal.

*Café Erotica*, 507 S.E.2d at 735 (quoting Ga. Code. Ann. § 32-7-75(b)(3) – emphasis added).

**Central Hudson Applied to S.C. Code. Ann. § 57-25-145.**

**First Prong.** The Lions Den is an adult bookstore which is in the business of selling sexually oriented materials to adults. This is, in general, a lawful activity, though it may be subject to some degree of regulation to avoid adverse secondary effects. *See Chesapeake B&M, Inc. v. Harford County, Maryland,* 58 F.3d 1005, 1009 (4th Cir. 1995) (noting that "bookstores that sell non-obscene adult material . . . engage in activity protected by the First Amendment" but noting that "[a] governmental entity may regulate sexually oriented businesses, including adult bookstores, in an effort to address the undesirable secondary effects associated with them" ). Plaintiff has submitted an affidavit that all of its activities are legal. No evidence to the contrary has been submitted. For purpose of this order, therefore, the court concludes that Plaintiff has met its burden of showing, by a preponderance of the evidence, that it is engaged in legal commercial activity.[15]

The signs at issue in this motion indicate only the name, nature and location of Plaintiff's business together, in the case of one or more signs, with a non-offensive outline of the profile of a lion. There is no suggestion that there is anything misleading about the limited information provided. Thus, the advertising at issue falls within the protections for commercial speech because it "concern[s] lawful activity and [is] not . . . misleading." *Central Hudson*, 447 U.S. at 566.

---

[15] In their opposition memorandum, Defendants declined to concede that Plaintiff operates a "lawful business." Defendants did not, however, offer any evidence (or even specific allegations) which would support the conclusion that The Lions Den engages in any unlawful activities. At oral argument, Defendants offered further argument on this point, suggesting that Plaintiff's cursory statement that the business was lawful was not enough. Defendants also offered to introduce printouts of portions of Plaintiff's website which gives more detail regarding its inventory (which presumably includes more videos and sex toys than books). Defendants did not, however, offer any evidence that even a single item sold was illegal, much less that the business as a whole was "unlawful." Neither did Defendants offer any evidence that Plaintiff has *ever* been cited for illegal activity. Certainly, such information would be available to Defendants, one of whom is the chief prosecuting officer of the state.

**Second Prong.** The court, therefore, turns to the second *Central Hudson* consideration, which is whether the state seeks to advance a substantial governmental interest. As to this prong, the Supreme Court has stressed the need to identify the state's interest with particularity.

> [W]e must identify with care the interests the State itself asserts. Unlike rational-basis review, the *Central Hudson* standard does not permit us to supplant the precise interests put forward by the State with other suppositions. Neither will we turn away if it appears that the stated interests are not the actual interests served by the restriction.

*Edenfeld v. Fane*, 507 U.S. 761, 768 (1993) (internal citations omitted).

Plaintiff identifies the two interests expressly referenced in the amendments to S.C. Code § 57-25-130 as the relevant interests: to "mitigate the adverse secondary effects of sexually-oriented businesses and limit harm to minors." *See* Dkt No. 8 at 17-18. Defendants maintain that the challenged restrictions are also supported by several of the broader purposes included in the statute as originally adopted. These concerns, which were not removed with the current revisions, include: "prevent[ing] unreasonable distraction of operators of motor vehicles"; "promot[ing] the safety, convenience, and enjoyment of travel on . . . highways within this State,"; and "promot[ing] the prosperity, economic well-being and general welfare of the State." *See* Dkt. No. 41 at 5. For present purposes, the court assumes that each of the concerns cited by the parties is a "substantial" concern capable of supporting reasonable regulation by the state.

**Third Prong.** As explained in *Lorillard Tobacco*, the third prong "concerns the relationship between the harm that underlies the State's interest and the means identified by the State to advance that interest." *Lorillard Tobacco*, 533 U.S. at 555. Thus, in considering the third prong, the court considers whether the absolute prohibition on off-site signs within one mile of a public highway "directly and materially advances" the substantial governmental interests identified under the second prong of the *Central Hudson* test. *See Greater New Orleans*, 527 U.S. at 188. As explained in

14

*Greater New Orleans*, the third prong requires that

> the speech restriction directly and materially advanc[e] the asserted governmental
> interest. This burden is not satisfied by mere speculation or conjecture; rather, a
> governmental body seeking to sustain a restriction on commercial speech must
> demonstrate that the harms it recites are real *and that its restriction will in fact
> alleviate them to a material degree*. Consequently, [a] *regulation may not be
> sustained if it provides only ineffective or remote support for the government's
> purpose*. . . . [T]his requirement is critical; otherwise, a State could with ease restrict
> commercial speech in the service of other objectives that could not themselves justify
> a burden on commercial expression.

*Greater New Orleans*, 527 U.S. at 188 (internal citations and quotation marks omitted, emphasis

added).

Defendants' argument that the interests are advanced by the outright ban is as follows:

> The restrictions on off-premises outdoor advertising reduce the ability of sexually-
> oriented businesses from *attracting minors*. In addition, the restrictions on billboards
> for sexually-oriented businesses will *remove a distraction for drivers, including
> easily distracted teenage drivers*. The billboards for sexually oriented businesses
> also *stimulate interest and curiosity in children*. The restrictions promulgated by
> Section 57-25-145 lessen this curiosity effect where children question the sign, its
> purpose and the type establishment that it advertises requiring parents to either
> explain the nature of sexually-oriented businesses to their children or lie to them. It
> is not unreasonable to believe that billboards along a highway cause many children
> to be exposed to sexually-oriented businesses before they have the maturity to
> understand what they see or may be told in explanation of what they see.

Dkt. No. 41 at 9-10 (emphasis added). Defendants also assert that the adverse secondary effects of

the signs will be mitigated "by *reducing transient customers* who have a higher likelihood of

committing criminal offenses in the surrounding areas." Dkt. No. 41 at 12 (emphasis added).[16]

For the reasons set forth below, the court finds Defendants' arguments insufficient to support

---

[16] At oral argument, defense counsel repeatedly used the term "transients" to refer to those non-local persons traveling the public highways who might visit an adult business. In other contexts, South Carolina officials refer to non-residents who may spend money in the State as "tourists." Tourism is, in fact, heavily encouraged by the State through, *inter alia*, the State's current standard license plate which bears the motto "Travel2SC.com."

a finding that there is a "direct and material" link between the State's substantial interests and the virtual ban[17] on off-site signs imposed by the Act, particularly as applied to Plaintiff's specific signs. First, the claimed connection between the broad prohibition on signs (even if as innocuous as Plaintiff's signs) and the identified governmental interests is not supported by any evidence. Defendants have not directed the court to any study, anecdotal evidence, or case law which suggests that teenagers are particularly likely to be attracted or distracted by an otherwise innocuous highway sign that advertises the existence and location of an adult or sexually oriented business (relative, for example, to signs that advertise favored fast food restaurants, fireworks stands, sports cars, shopping malls, or teenager-friendly local attractions). *See Central Hudson*, 447 U.S. at 569-71 (allowing consideration of various forms of evidence). Common sense, likewise, suggests that otherwise neutral signs advertising adult businesses do not pose any greater distraction to the teenage driver (or any other driver) than do any other road signs which may cause the driver to begin thinking of something other than the road ahead (which is, of course, the purpose of all billboards). Thus, neither evidence nor common sense supports Defendants' first premise that removing billboards such as those used by The Lions Den will make the roads any safer for teenage (or other) drivers.

Defendants rely on a single sentence from a New Jersey case in support of their claim that South Carolina's virtual ban on off-site signs directly and materially advances the State's substantial interest in traffic safety. The relevant sentence reads as follows: "The Legislature could reasonably conclude that the nature and content of the signs of sexually oriented businesses cause greater distraction to motorists than other commercial signs." *Hamilton Amusement Center v. Verniero*, 716

---

[17] The Act only allows signs for adult businesses if placed more than one mile from a public highway. It seems doubtful that such a sign would serve any advertising purpose. Thus, the court considers the restrictions in the South Carolina statute to amount to a virtual ban on off-site signs.

A.2d 1137, 1147 (N.J. 1998).

The first difficulty with Defendants' reliance on this singular statement is that the restrictions at issue in *Verniero* related only to signs posted on the business itself. Thus, the area in which the traffic concerns existed (immediately in the area of the business) differed from the areas at issue in the present action (off-site and, as relates to Plaintiff, on limited-access interstate highways). The *Verniero* court's focus on the "nature and content of the signs," likewise, suggests an important distinction. Unlike the statute at issue in *Verniero* which only regulated size, number and content of signs based on concerns over the "nature and content of the signs," the statute at issue here is a virtual ban on all off-site advertising based simply on the identity of the advertiser (not the nature and content of the sign).[18] These distinctions dissuade this court from reliance on *Verniero* as supporting a "direct and material" connection between South Carolina's virtual ban on off-site advertising and Defendants' claimed traffic safety concerns.

The court will, nonetheless, assume for present purposes that some percentage of the teenage populace will be "attracted" by such a sign. That is, the court assumes that some number of teenagers may, because they see such a sign, try to visit the advertised business which carries with it some increased risk that they will gain entry. It is, however, doubtful that this somewhat remote linkage would satisfy the *Central Hudson* requirement that there be a "direct and material" link between the State's substantial concern (protecting minors) and its means of achieving that concern (a virtual ban on outdoor advertising).

---

[18] As the *Verniero* court acknowledged through a "*but cf.*" cite, courts have been reluctant to uphold prohibitions or restrictions on the use of signs based solely on a the identity of the speaker. *Id.* ("*But cf. Rappa v. New Castle County*, 18 F.3d 1043, 1082 (3d Cir.1994) (Garth, J., concurring and dissenting) ('[T]he allowance of some signs, but not others, is evidence that the government's asserted interests in traffic safety and aesthetics are not sufficiently compelling to justify disparate treatment between classes of speech.').").

17

Defendants' concern that parents might need to explain to a child what is meant by some euphemism for "sexually-oriented business" (*e.g.,* "adult bookstore" or "gentlemen's club"), presents only an attenuated link to the claimed protective purpose underlying the advertising ban. In the modern age, parents are often required to limit their children's access to inappropriate materials including radio and television programs, books, videos and even certain articles (or advertisements) in newspapers in which a child might see announcements.

For these reasons, the court finds it likely that Plaintiff will prevail on the merits as to the third prong of the *Central Hudson* test. As in *Passions Video*, however, the clearest obstacle to survival of the statute results from application of *Central Hudson's* fourth prong.

**Fourth prong.** In applying *Central Hudson's* fourth prong, the court considers whether the regulation or restriction on commercial speech is more extensive than is necessary to serve the state's interests. When the legislative goal of a law can be accomplished in a manner less intrusive to First Amendment rights, the adoption of a more burdensome restriction is unconstitutional. *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 507 (1996); *Lorillard*, 533 U.S. at 566-67. "If the First Amendment means anything, it means that regulating speech must be a last – not first – resort." *Thompson v. Western States Medical Center*, 535 U.S. 357, 373 (2002) (addressing restrictions on commercial speech).

Outright bans on commercial expression fare poorly under this analysis. For example, in *Lorillard Tobacco*, 533 U.S. at 534-35, the Court considered a Massachusetts prohibition on advertising smokeless tobacco and cigars within one thousand feet of a school or playground. The Commonwealth asserted that the regulations were adopted to address "underage use of tobacco products [by] limiting youth exposure to advertising." *Id.* at 556. Despite ample proof of a problem with underage tobacco use, and despite concluding that the advertising ban at issue would materially

18

advance a substantial state interest in remediating that problem, the Court held that the regulations

ultimately did not survive First Amendment scrutiny, because their sweep was far greater than

necessary to achieve their stated end.

> Whatever the strength of the . . . evidence to justify the outdoor advertising regulations, however, we conclude that the regulations do not satisfy the fourth step of the *Central Hudson* analysis. The final step of the *Central Hudson* analysis, the "critical inquiry in this case," requires a reasonable fit between the means and ends of the regulatory scheme. The Attorney General's regulations do not meet this standard. The broad sweep of the regulations indicates that the Attorney General did not "carefully calculat[e] the costs and benefits associated with the burden on speech imposed" by the regulations.

*Lorillard Tobacco*, 553 U.S. at 561 (citing and quoting *Central Hudson*, 447 U.S. at 569, and

quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 (1993)(internal quotation marks

omitted by the *Lorillard* Court)). The Court found that the ban prohibited certain outdoor advertising

across a substantial geographic area, including most urban areas, and would substantially frustrate

the efforts of merchants to communicate the availability and features of their products to adult

consumers, with the immediacy that is facilitated by outdoor signage.

> We must consider that tobacco retailers and manufacturers have an interest in conveying truthful information about their products to adults, and adults have a corresponding interest in receiving truthful information about tobacco products.
>
> * * *
>
> If some retailers have relatively small advertising budgets, and use few avenues of communication, then the Attorney General's outdoor advertising regulations potentially place a greater, not lesser, burden on those retailers' speech.

*Lorillard Tobacco*, 553 U.S. at 564 (internal citation to the court of appeals omitted).

At least part of the ostensible justification offered by the General Assembly for the adoption

of Section 57-25-145(A) – to "limit harm to minors" – was expressly rejected by the Supreme Court

in *Lorillard*, 533 U.S. at 581 (Thomas, J. concurring in part), as an adequate reason for prohibiting

the restrictions on advertising there at issue:

> We have held consistently that speech cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them.
>
> * * *
>
> Outside of the broadcasting context, we have adhered to the view that the governmental interest in protecting children from harmful materials does not justify an unnecessarily broad suppression of speech addressed to adults.

*Lorillard Tobacco*, 553 U.S. at 581-82 (Thomas, J., concurring in part – internal citations and quotation marks omitted).

Similarly, in *Erznoznik v. Jacksonville,* 422 U.S. 205, 207 (1975), the Court invalidated a municipal ordinance which barred drive-in theaters with screens visible from public streets from showing films which contained nudity based on a stated purpose of preventing children from seeing images not appropriate for the young. The Court explained as follows:

> The ordinance is not directed against sexually explicit nudity, nor is it otherwise limited. Rather, it sweepingly forbids display of all films containing any uncovered buttocks or breasts, irrespective of context or pervasiveness. Thus it would bar a film containing a picture of a baby's buttocks, the nude body of a war victim, or scenes from a culture in which nudity is indigenous. The ordinance also might prohibit newsreel scenes of the opening of an art exhibit as well as shots of bathers on a beach.
>
> * * *
>
> *Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them.* In most circumstances, the values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors.

*Erznoznik*, 422 U.S. at 213-14 (citations omitted) (emphasis added). *See also 44 Liquormart*, 517 U.S. 484 (invalidating state statute which prohibited advertising prices of alcoholic beverages where state failed both to demonstrate prohibition would be effective in serving its proffered justifications of promotion of temperance and public safety and discouragement of alcohol abuse and where the total ban was not narrowly tailored to achieve its stated goal).

As explained in *44 Liquormart*, wholesale bans on advertising merit an especially critical

review when it comes to efficacy.

> In this case, there is no question that Rhode Island's price advertising ban constitutes a blanket prohibition against truthful, nonmisleading speech about a lawful product. There is also no question that the ban serves an end unrelated to consumer protection. Accordingly, we must review the price advertising ban with "special care," mindful that speech prohibitions of this type rarely survive constitutional review.

*44 Liquormart*, 517 U.S. at 504 (quoting *Central Hudson*, 447 U.S., at 566, n. 9).  Wholesale bans on truthful commercial expression can only be met by the most demonstrably efficacious laws, and

> may not be sustained if it provides only ineffective or remote support for the government's purpose.  For that reason, the State bears the burden of showing not merely that its regulation will advance its interest, but also that it will do so to a material degree. The need for the State to make such a showing is particularly great given the drastic nature of its chosen means – the wholesale suppression of truthful, nonmisleading information. Accordingly, we must determine whether the State has shown that the price advertising ban will *significantly* reduce alcohol consumption.

*44 Liquormart*, 517 U.S. at 505 (internal citations omitted) (italics by the Court).

In light of the above precedent, this court finds a high probability that Plaintiff will succeed in establishing that the challenged statute fails the fourth prong of the *Central Hudson* test, at least as applied to Plaintiff's current signs.  The restrictions at issue amount to a virtual ban on use of an entire medium, outdoor signage.  It is difficult to envision that such a near-total statewide ban would be found to be sufficiently narrowly drawn, particularly when compared to the narrower restrictions struck down in cases such as *Lorillard* and *44 Liquormart*.

It is also of some concern that Section 57-25-145 severely limits advertising related to activities which are not only lawful, but constitutionally protected. *Chesapeake B&M, Inc*., 58 F.3d at 1109 (4th Cir. 1995).  The constitutionally protected nature of the businesses targeted by the statute suggests particular care should be given to insure that the advertising limits are not, in effect, an attempt to destroy the businesses themselves. *See supra* n. 14.

For the above reasons, the court concludes that Plaintiff has shown a strong likelihood of success on the merits.

**Balance of Harms.**   As the Supreme Court held, in *Elrod v. Burns*, 427 U.S. 347 (1976), "the loss of First Amendment rights, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id*. at 373; *Giovani Carandola*, 303 F.3d at 520-21.   Thus, by proving a likelihood of success on the merits, Plaintiff also establishes the first element necessary for grant of a preliminary injunction, that it will suffer an irreparable injury if relief is not granted.

This risk of harm to Defendants if Defendants are enjoined from enforcement of the statute pending resolution of this action is minimal.  At worst, there will be a continuation of a status quo that has existed since passage of the Act in February 2006.  Moreover, Defendants do not have a legal interest in the enforcement of an unconstitutional statute. *See Giovani Carandola*, 303 F.3d at 521 ("[W]e agree with the district court that a state is 'in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional.  If anything, the system is improved by such an injunction."– citation omitted).

**Public Interest.**  The public interest favors issuance of a preliminary injunction against enforcement of a statute likely to be held unconstitutional.  At the least, the public interest is neutral given that issuance of an injunction will merely preserve a status quo which has existed for over three years and which has not been shown to be causing any current substantial harm.

**Bond.**  The purpose of the bond is to provide security for any damages resulting from an improvidently granted injunction. Fed. R. Civ. Pro. 65(c).  The court finds that a bond of one hundred dollars ($100) is appropriate.  Plaintiff shall pay the bond prior to February 22, 2009, the date the Act would become enforceable against Plaintiff but for the issuance of the injunction.

**CONCLUSION**

For the reasons set forth above, the court grants Plaintiff's motion and enjoins Defendants or others acting in concert with them or with knowledge of this order, from enforcing S.C. Code Ann. § 57-25-145 against Plaintiff pending resolution of this matter on the merits. The court orders that Plaintiff post a bond of one hundred dollars ($100) prior to February 22, 2009.

**IT IS SO ORDERED.**

s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
February 17, 2009